**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
                          )
EARL ROBERSON, JR.,       )
                          )
        Plaintiff,        )
     v.                   )   Civil Action No. 03-2135 (RWR)
                          )
JOHN W. SNOW,             )
                          )
        Defendant.        )
                          )
```

## MEMORANDUM OPINION

Plaintiff filed a complaint alleging that the Internal Revenue Service ("IRS") discriminated against him by failing to select him for a promotion.  Plaintiff also claims that after he filed a grievance regarding his non-selection for the promotion, the defendant retaliated against him by initiating two investigations, which led to plaintiff's arrest and prosecution. Defendant has filed a motion for summary judgment, arguing that plaintiff was not selected for the promotion because of his relatively low rating from the interviewing committee and that the investigations leading to plaintiff's arrest and prosecution occurred in response to employees' reports of threats plaintiff made against his superiors.

Because the plaintiff has failed to rebut the defendant's valid, non-discriminatory justifications for plaintiff's non-promotion, investigation, and prosecution, defendant's motion for summary judgment will be granted.

- 2 -

<u>BACKGROUND</u>

Plaintiff, an African-American male, is a career federal employee who has worked for the IRS for over twenty-two years. (Compl. at 2-3.)  Plaintiff is a GS-13 level computer specialist and is employed in the Statistics of Income Division ("SOI") of the IRS, which publishes data with respect to the operation of tax laws.  (<u>Id.</u> at 3; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem. Opp'n") at 1; Def.'s Mot. Summ. J., Ex. 1,  Dep. of Daniel Skelly ("Skelly Dep.") at 8.)  Daniel Skelly was the SOI director until early 2001, at which time Thomas Petska replaced him.  (Pl.'s Mem. Opp'n at 3; Compl. at 3-4.)

On June 5, 2000, the SOI announced vacancies for computer specialist positions at the GS-14 level.  (Compl. at 3; Def.'s Mot. Summ. J., Ex. 2, SOI Div. Vacancy Announcement.)  The "vacant" positions were actually promotions, whereby the selected persons would continue in their same jobs, but at the GS-14 level rather than the GS-13 level.  (Def.'s Mot. Summ. J., Ex. 3, Dep. of Denise Herbert ("Herbert Dep.") at 68:9-21.)  On June 16, 2000, plaintiff submitted his application for the promotion. (Compl. at 3.)  Over thirty people applied for up to twenty available positions.  (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem. Supp.") at 3-4; Def.'s Mot. Summ. J., Ex. 4, Promotion Certificate.)

- 3 -

SOI director Skelly selected a three-member ranking panel to review the submitted applications and rank the applicants. (Skelly Dep. at 78; Def.'s Mem. Supp. at 3.)  The panel members were chosen on the basis of their knowledge about computers and status as management officials.  (Skelly Dep. at 78-79; Def.'s Mem. Supp. at 3.)  After selecting the ranking committee, Skelly did not meet with the panel members, give them any instructions on how to rank candidates, participate in the panel's deliberations, tell them which applicants he wanted to be ranked highest, or indirectly suggest to the panel his preferences. (Skelly Dep. at 82.)  The panel members were to apply a mathematical formula used by the personnel office when ranking applicants.  (Herbert Dep. at 41-42.)

The mathematical formula used by the panel scored the applicants based on three factors: (1) the applicant's performance evaluation completed during the previous year by the applicant's supervisor; (2) a review of the applicant's knowledge, skills, and abilities ("KSAs"); and (3) awards received by the applicant in the last three years.  (Pl.'s Stmt. Gen. Iss. at 12.)  The maximum score possible for any applicant was fifty-three points - - thirty points for the performance evaluation, twenty points for the KSAs review, and three points for awards.  (Id.)

- 4 -

The score for the first factor - - the prior year's
performance evaluation - - was computed by calculating the
candidate's average performance score on multiple categories of
the prior year's performance evaluation and multiplying that
value by six.  (Herbert Dep. at 46-49.)  Panel members assessed
the applicant's knowledge, skills, and abilities - - the second
factor - - based upon both the prior year's performance
evaluation and the content of the employee's application for the
promotion.  (Id. at 51-56.)  The final factor - - awards - - was
scored by looking at the performance awards or quality step
increases given to the candidate in the last three years,
information called for on each application.  (Id. at 56.)  The
panel members did not interview the applicants.  (Id. at 51-52.)

After calculating the total scores for each applicant, the
panel provided the scoring information to the personnel office in
New Carrollton, Maryland.  (Herbert Dep. at 43.)  Subsequently,
both the panel and the personnel office reviewed the package to
determine a "Best Qualified" cut-off point.  (Id. at 43-46.)  The
cut-off point was calculated by looking at the number of
available positions.  (Id. at 69-71, 73-74.)  For the first
available position, four applicants appeared on the Best
Qualified List.  (Id. at 69.)  For each additional available
position after the first, the applicant with the next highest
score was placed on the list.  Tie scores placed more than one

- 5 -

applicant's name on the list.  (Id. at 73.)  Twenty positions
were potentially available and resulted in a total of thirty
applicants appearing on the Best Qualified List.  (Def.'s Mot.
Summ. J., Ex. 6, Evaluation Criteria Scores ("Listed Rankings").)

The cut-off point established for the SOI promotions was a
score of 44.7.  (Def.'s Mot. Summ. J., Ex. 6, Listed Rankings);
Def.'s Stmt. Mat. Facts at 4.)[1]  The panel calculated plaintiff's
overall score to be 35.12, and therefore, plaintiff did not
appear on the Best Qualified List.  (Def.'s Mot. Summ. J., Ex. 5,
Rating Sheet for Pl.; Def.'s Mem. Supp. at 4-5.)  Only the names
and application materials of the individuals on the Best
Qualified List were given to Skelly, the selecting official.
(Herbert Dep. at 66.)  Skelly interviewed only applicants on that
list and selected fourteen of them for the promotion on January
2, 2001.  (Def.'s Mem. Supp. at 5; Skelly Dep. at 70.)

Although Skelly did not name the employees selected for
promotion until January 2, 2001 (Skelly Dep. at 70), plaintiff
claims that he knew on or about November 20, 2000, that he was
not chosen when a list bearing the names of those who were
promoted was affixed to the back of his chair.  (Compl. at 3;
Pl.'s Mem. Opp'n, Ex. 6, Dep. of Earl Roberson ("Roberson Dep.")

---

[1]  The plaintiff states that the cut-off score was 45.74
(Pl.'s Stmt. Gen. Iss. at 12), but that score does not correspond
with the cited evidence.  In any event, plaintiff's score did not
reach that mark.

at 29-31.)  From December 2000 to January 2001, plaintiff
unsuccessfully asked the personnel office for his ranking score,
and questioned superiors David Paris and Skelly about the status
of the promotion selections.  (Pl.'s Mem. Opp'n, Ex. 1, Aff. of
Earl Roberson ("Roberson Aff.") at 2.)  During this time,
plaintiff's fellow employees started to yell across his cubical,
harassing and taunting him with statements about his non-
promotion.  (Id.; Pl.'s Mem. Opp'n at 8.)  Plaintiff told Scott
Luttrell, an economist at SOI, that he was going to use "a
pencil, a piece of paper, and a rulebook" to fight with because
management was not following the rules.  (Roberson Dep. at 50;
Roberson Aff. at 2.; Pl.'s Mem. Opp'n at 8.)

On January 17, 2001, plaintiff filed a grievance with the
National Treasury Employees Union ("NTEU") over his non-selection
for the promotion.  (Compl. at 4.)  Plaintiff alleged that his
employer engaged in prohibited personnel practices and
discrimination based on sex, color, and race.  (Id.; Def.'s Mem.
Supp. at 5.)  A collective bargaining agreement adopted by the
IRS and NTEU requires an employee who believes he has been
discriminated against to make a binding choice between raising
his claims under either the statutory procedure outlined in
42 U.S.C. § 2000e-16 or the negotiated grievance procedure, but
not both.  (Def.'s Mot. Summ. J., Ex. 7, 2002 Nat'l Agreement:

IRS and NTEU at 112-13.)  Plaintiff elected to pursue relief via
the internal negotiated grievance procedure.  (Compl. at 4.)

On February 6, 2001, SOI manager Chris Carson contacted the
Treasury Inspector General for Tax Administration ("TIGTA")
Office, otherwise known as the IRS police, to report that
plaintiff allegedly made threatening statements.  (Def.'s Mem.
Supp. at 5-6.)  TIGTA interviewed Carson, as well as Andrew
Luttrell and Dean Plueger, economists at SOI.  (Def.'s Mot. Summ.
J., Ex. 9, Report of Investigation of Threats to Director Skelly
("Skelly Threat Investigation").)  Carson alleged that plaintiff
had "hypothetically talked about how easy he could bring a gun
into the building and shoot his manager" and that "he would only
get six months to a year jail time by pleading temporary
insanity."  (Id. at 4.)  Carson also alleged that plaintiff said
"he could give a homeless person [fifty dollars] and a knife to
stick it in Skelly's neck while he was walking to Union Station."
(Id.)  Luttrell stated that plaintiff said that if someone were
under the same amount of stress that plaintiff was, he might
respond "violently" or "retaliate by bringing a gun into the
office."  (Id. at 7.)  According to Luttrell, plaintiff added
that "[i]t would be very easy to just walk into the boss's office
and shoot him" and that he could also have a homeless person
"stab Skelly in the neck while he [was] walking to Union
Station."  (Id.)  Dean Plueger testified that he overheard the

- 8 -

conversation between Luttrell and plaintiff.  (Id. at 10.)
Special Agent Ratliff checked plaintiff's arrest record and found
that plaintiff had previously been convicted for carrying a
concealed weapon without a license, possession of an unregistered
firearm, unlawful possession of ammunition, and driving with an
open container.  (Id. at 13-23.)

On February 7, 2001, Paris, one of plaintiff's superiors,
came to plaintiff's desk and identified plaintiff to TIGTA
Special Agent Kevin Jackson.  (Compl. at 4.)  Jackson forcibly
removed plaintiff from his work area and led him to plaintiff's
manager's office.  Jackson there alerted plaintiff that the agent
acted because plaintiff had made a threat of violence against
Skelly.  (Id.)  Plaintiff initially denied making any such
statements, but later said that perhaps his comments were made
jokingly and taken out of context by surrounding co-workers.
(Pl.'s Mem. Opp'n, Ex. 21, Dep. of Kevin Jackson ("Jackson Dep.")
at 61:6-13.)  Jackson felt that the witnesses probably
misunderstood plaintiff's comments and thought that he was
serious.  (Id. at 61:14-20.)  Nevertheless, Jackson admonished
plaintiff and advised him of the penalties for making threats
against fellow employees.  (Id. at 62:2-8.)

The First Step meeting between plaintiff, his NTEU union
representative, Gerald Plater, and a management official, Kay
Khuu, to discuss plaintiff's non-promotion grievance occurred on

- 9 -

April 11, 2001.  (Roberson Aff. at 3.)  On May 2, 2001, Khuu

found that the only personnel violation that had occurred did not

warrant the relief plaintiff sought.[2]  (Def.'s Mot. Summ. J., Ex.

13, Grievance of Earl Roberson First Step Response ("First Step

Response") at 7.)  During this time, plaintiff also filed a claim

with TIGTA that IRS management triggered Jackson's investigation

in retaliation for the grievance plaintiff had filed.[3]  (Def.'s

Mot. Summ. J., Ex. 15, Report of Investigation ("TIGTA

Retaliation Report") at 1.)  After investigating the retaliation

complaint, TIGTA found "no evidence of retaliation on the part of

IRS SOI management" and, instead, found that management had

reported the alleged threats out of concern for their employees.

(Id. at 6.)

On May 31, 2001, a Second Step meeting occurred between

plaintiff, his union representatives, and Paris to discuss

plaintiff's discrimination and retaliation claims.  (Compl. at

5.)  On June 22, 2001, Paris sent plaintiff a written memorandum

---

[2]  The ranking officials, one of whom was the immediate
manager for applicant AA8, failed to prepare separate rankings
for applicant AA8.  (Def.'s Mot. Summ. J., Ex. 13, First Step
Response at 4.)  The infraction involved only one other applicant
being ranked above the plaintiff.  (Id.)  Even if this error had
not occurred, however, plaintiff would still not have had a
sufficient score to be included on the Best Qualified List.  (See
Def.'s Mot. Summ. J., Ex. 6, Document Listing Rankings at 1.)

[3]  Plaintiff states that this claim was filed on May 10,
2001.  (Roberson Aff. at 4.)  However, the TIGTA's report
indicates that the claim was filed on April 18, 2001.  (Id.)

stating that plaintiff's grievance lacked merit and that the determination from the First Step meeting that relief was not warranted was correct. (Def.'s Mot. Summ. J., Ex. 14, Second Step Mem. Denying Grievance ("Second Step Response") at 5.) In August 2001, plaintiff attended a Third Step meeting to discuss his grievances. Following that meeting, Petska, the new SOI director, issued a response letter to plaintiff concluding that there was no basis for plaintiff's allegations of discrimination or retaliation. (Def.'s Mot. Summ. J., Ex. 17, Third Step Mem. Denying Grievance ("Third Step Response") at 4.)

Meanwhile, in July 2001, Petska contacted TIGTA alleging that plaintiff made threats against him in the presence of his co-workers. (Def.'s Mem. Supp. at 8.) TIGTA opened a second investigation on July 2, 2001, and co-workers Martha Eller and Catherine Gullickson Thomas alleged that plaintiff made comments that "he was going to take [Petska] out" and that he would "come in like a ninja and they would never know it." (Def.'s Mot. Summ. J., Ex. 16, Report of Investigation of Threats to Director Petska ("Petska Threat Investigation") at 307-11.) Gullickson Thomas said she asked plaintiff about whom he was talking, and plaintiff allegedly said "Tom." (Id. at 310.) Plaintiff denies making any such threatening statements or comments. (Roberson Aff. at 12.)

- 11 -

On October 30, 2001, Jackson obtained a warrant for
plaintiff's arrest based on the results of the two TIGTA
investigations.  (Def.'s Mot. Summ. J., Ex. 18, Aff. Supp. Arrest
Warrant at 180; Def.'s Mot. Summ. J., Ex. 16, Petska Threat
Investigation at 317.)  Plaintiff was arrested on November 1,
2001, and charged with making threatening statements.  (Def.'s
Mot. Summ. J., Ex. 16, Petska Threat Investigation at 318.)  The
District of Columbia Superior Court ordered plaintiff to stay
away from Petska.  (Def.'s Mot. Summ. J., Ex. 18, Release Order
Addendum at 182.)  The IRS barred plaintiff from entering all IRS
buildings pending resolution of his case (Def.'s Mot. Summ. J.,
Ex. 20, Bar Notice), and indefinitely placed plaintiff on
administrative leave.  (Def.'s Mot. Summ. J., Ex. 21, Admin.
Leave Notice.)

Plaintiff's criminal bench trial began on April 15, 2002 and
plaintiff was acquitted on April 24, 2002.  (Def.'s Mem. Supp. at
10.)  Plaintiff returned to work approximately one month later.
(Roberson Aff. at 12.)  Plaintiff had responded to various emails
he received during his time away from work with messages such as
"I'm Back!!!!!"  (Pl.'s Mem. Opp'n, Ex. 15, Email to Denise
Herbert at 203.)  Plaintiff directed one such message to at least
one co-worker who had testified against him at trial and who felt
threatened by the message.  (Pl.'s Mem. Opp'n at 15; Def.'s Reply
to Pl.'s Opp'n at 6.)  On June 11, 2002, plaintiff received a

letter from his employer censuring him for inappropriately using
the IRS email system.  (Pl.'s Mem. Opp'n at 15.)

Following further proceedings, the IRS issued its final
agency decision in January 2003, finding no discrimination in
plaintiff's non-promotion, and no retaliation by defendant
against plaintiff in TIGTA's investigations and arrest of
plaintiff.  (Pl.'s Mem. Opp'n, Ex. 16, Final Agency Decision.)
This final order exhausted the plaintiff's administrative remedy,
after which plaintiff timely appealed his employer's final ruling
in the administrative grievance process to the EEOC on
March 10, 2003.  (Pl.'s Mem. Opp'n, Ex. 17, Complainant's Br.
Supp. Appeal ("EEOC Appeal"); Pl.'s Mem. Opp'n, Ex. 18, EEOC
receipt letter.)  See 5 U.S.C. § 7121(d) (allowing a plaintiff to
appeal final agency decisions of discrimination complaints to the
EEOC).  On October 17, 2003, plaintiff elected to pursue the
claim in federal court instead of with the EEOC.[4]  (Pl.'s Mem.

---

[4] To the extent defendant argues that plaintiff has failed
to properly and timely exhaust his administrative remedies under
the grievance procedure, that contention is without merit.  Under
the plaintiff's union agreement, employees who wish to raise a
claim of discrimination have the right to do so "under the
statutory procedure or the negotiated grievance procedure . . .
but not both."  (Def.'s Mot. Summ. J., Ex. 7, 2002 Nat'l
Agreement: IRS and NTEU at 113.)  Here, plaintiff originally
elected to raise his claims through the negotiated grievance
procedure with the NTEU.  (Compl. at 4.)  Each of plaintiff's
claims of discrimination and retaliation proceeded through the
NTEU's grievance process and was exhausted by the January 23,
2003, final agency decision letter.  (Pl.'s Mem. Opp'n, Ex. 16,
Final Agency Decision.)  Plaintiff properly appealed these claims
to the EEOC on March 5, 2003.  (Pl.'s Mem. Opp'n, Ex. 17, EEOC

- 13 -

Opp'n, Ex. 19, Plaintiff's letter to EEOC choosing federal court.)

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998). In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party. Levant v. Roche, Civil Action No. 02-704 (EGS), 2005 WL 1847301, at *2 (D.D.C. Aug. 5, 2005); R. v. District of Columbia, 370 F. Supp. 2d 267, 270 (D.D.C. 2005); Price v. Greenspan, 374 F. Supp. 2d 177, 180 (D.D.C. 2005) ("The Court is precluded from weighing evidence or finding disputed facts and must draw all inferences and resolve all doubts in favor of the non-moving party."); see also Aka, 156 F.3d at 1288.

The moving party carries the initial burden to either identify evidence that demonstrates the absence of a genuine issue of material fact, see Celotex Corp. v. Catrett, 477 U.S.

---

Appeal.)  Because the EEOC failed to return a final decision on plaintiff's appeal within 180 days, plaintiff elected to file his claims in federal court, as he was entitled to do.  29 C.F.R. § 1614.407.

317, 323 (1986), or "point[] to the absence of evidence proffered
by the nonmoving party." Baker v. Potter, 294 F. Supp. 2d 33, 38
(D.D.C. 2003).  Summary judgment is inappropriate if a reasonable
factfinder could find in the non-moving party's favor.  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The non-
moving party's opposition, however, 'must consist of more than
mere unsupported allegations or denials and must be supported by
affidavits or other competent evidence setting forth specific
facts showing that there is a genuine issue for trial.'"  McCain
v. CCA of Tenn., Inc., 254 F. Supp. 2d 115, 119 (D.D.C. 2003)
(citation omitted); see Harding v. Gray, 9 F.3d 150, 154 (D.C.
Cir. 1993) ("[A] mere unsubstantiated allegation . . . creates no
'genuine issue of fact' and will not withstand summary
judgment."); Sage v. Broad. Publ'ns, Inc., 997 F. Supp. 49, 53
(D.D.C. 1998) ("Conclusory allegations made in affidavits
opposing a motion for summary judgment are insufficient to create
a genuine issue of material fact."); Baker, 294 F. Supp. 2d at 38
(holding that a nonmoving party may not rely solely on
allegations or conclusory statements).  "If the evidence 'is
merely colorable, or is not significantly probative, summary
judgment may be granted.'"  Baker, 294 F. Supp. 2d at 38 (quoting
Anderson, 477 U.S. at 249-50).

- 15 -

I.   DISCRIMINATION CLAIM

Discrimination claims brought under Title VII are governed by the burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green. 411 U.S. 792, 802 (1973); Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1149 (D.C. Cir. 2004). Under that framework, the plaintiff has the initial burden of demonstrating by a preponderance of the evidence a prima facie case of discrimination. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If a plaintiff succeeds in establishing his prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action being challenged. See id. at 253. The employer "need not persuade the court that it was actually motivated by the proffered reasons." Id. at 254. Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting Burdine, 450 U.S. at 254-55, and n.8)(internal quotation marks omitted).

If the defendant proffers a legitimate and nondiscriminatory justification for its employment decision, the plaintiff must have an opportunity to prove by a preponderance of the evidence

- 16 -

that the offered reason was not the defendant's true reason, but was a pretext for intentional discrimination.  See Burdine, 450 U.S. at 253.  A plaintiff may meet his burden of proving intentional discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Id. at 256.  Ultimately, the question is whether the jury could infer discrimination based on a combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to challenge the employer's proffered reasons for its decision; and (3) any additional evidence of discrimination that may be available to the plaintiff (e.g., independent evidence of discriminatory attitudes or statements attributable to the employer).  See Aka, 156 F.3d at 1289.  The ultimate burden of persuasion that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  See Burdine, 450 U.S. at 253.

    A.    Plaintiff's prima facie case

    The plaintiff carries the initial burden of establishing a prima facie case of discrimination.  Burdine, 450 U.S. at 252-53. The elements of a prima facie case of employment discrimination include proof that (1) plaintiff is a member of a protected class; (2) plaintiff was subject to an adverse employment action; and (3) similarly situated employees outside of his protected

class were treated more favorably in like circumstances.
Burdine, 450 U.S. at 253.

Here, it is undisputed that plaintiff, an African-American,
is a member of a protected class.  (Compl. at 2; Answer at 2.)
It is also clear that plaintiff suffered an adverse employment
action when he was not selected to receive a promotion.[5]  (Def.'s
Mem. Supp. at 5.)  The final requirement in establishing the
prima facie case is also met in that thirteen of the fourteen GS-
13 computer specialists promoted were white.  (Pl.'s Mem. Opp'n
at 5-6.)  The burden of establishing a prima facie case of
discrimination "is not onerous,"  Burdine, 450 U.S. at 253, and
plaintiff has met his burden here.

B.   Defendant's neutral explanation

Because the plaintiff has established a prima facie case
giving rise to a "presumption of discrimination," the burden
shifts to the defendant "to rebut the presumption of
discrimination by producing evidence that the plaintiff was
rejected, or someone else was preferred, for a legitimate,

---

[5]  Defendant argues that plaintiff cannot show that he
suffered an adverse employment action because the letter
reprimanding plaintiff for using the e-mail system would not
constitute an adverse action.  (Def.'s Mem. Supp. at 21.)  That
argument is a straw man, because the adverse action here is the
plaintiff's non-selection for the GS-14 level promotion.  See
Brown v. Brody, 199 F.3d 446, 456-57 (D.C. Cir. 1999) (stating
that when a plaintiff has suffered objectively tangible harm,
such as "hiring, firing, failing to promote, [etc.]" the
plaintiff has suffered an adverse action by his employer.)

- 18 -

nondiscriminatory reason." Burdine, 450 U.S. at 254.  The
defendant must set forth the reasons for the plaintiff's
rejection, and this explanation must be legally sufficient to
sustain a judgment for the defendant.  See id. at 255.  "If the
defendant carries this burden of production, the presumption
raised by the prima facie case is rebutted, and the factual
inquiry proceeds to a new level of specificity."  Id.

Here, to rebut the presumption of discrimination, defendant
asserts that its selection process was race-neutral and
objective.  (Def.'s Mem. Supp. at 2-5.)  The two-tiered process
of selecting employees for promotion began with a three-member
panel that mathematically calculated scores based on the
employee's prior performance evaluation, the content of the
employee's application for the promotion, and the number of
awards received by the employee in the previous three years.
(Id. at 3.)  The panel did not interview the candidates, and it
did not directly choose which employees would receive interviews
by Skelly, the selecting official.  (Herbert Dep. at 45, 51-52.)
Instead, the panel scored each applicant, and later, with the
assistance of the personnel office, determined a cut-off point
based on the number of available positions to determine which
employees were selected to interview with Skelly.  (Herbert Dep.
at 44, 49, 66.)  Defendant asserts that the minimum score to be
placed on the Best Qualified List and receive an interview was

- 19 -

44.7.  (Herbert Dep. at 74.)  Plaintiff's score of 35.12 placed
him at the bottom of the applicant list.  (Def.'s Mot. Summ. J.,
Ex. 6, Listed Rankings.)  Defendant explains that plaintiff's
application was "brief and lacked specific details."  (Def.'s
Mot. Summ. J., Ex. 13, First Step Response at 3.)

Defendant has produced sufficient evidence to indicate a
legitimate, non-discriminatory reason for plaintiff's non-
promotion by showing that the other applicants achieved higher
scores when their applications were graded.  (See Def.'s Mot.
Summ. J., Ex. 6, Listed Rankings.)  Consequently, defendant has
met his burden to rebut the presumption of discrimination.

   C.   <u>Plaintiff's evidence of pretext</u>

If the defendant proffers a legitimate and nondiscriminatory
reason for its employment decision, the plaintiff must have an
opportunity to prove by a preponderance of the evidence that the
offered reason was not the employer's true reason, but was a
pretext for intentional discrimination.  See <u>Burdine</u>, 450 U.S. at
253.  A plaintiff may meet his burden of proving intentional
discrimination by "'either directly persuading the court that a
discriminatory reason more likely motivated the employer or
indirectly by showing that the employer's proffered explanation
is unworthy of credence.'"  <u>Dunaway v. Int'l Bd. of Teamsters</u>,
310 F.3d 758, 763 (D.C. Cir. 2002)(quoting <u>U.S. Postal Serv. Bd.
of Governors v. Aikens</u>, 460 U.S. 711, 716 (1983)).  To survive a

- 20 -

motion for summary judgment, the plaintiff must "'show that a
reasonable jury could conclude that [he] was [rejected] for a
discriminatory reason.'"  Morgan v. Fed. Home Loan Mortgage
Corp., 328 F.3d 647, 651 (D.C. Cir. 2003) (quoting Waterhouse v.
District of Columbia, 298 F.3d 989, 992 (D.C. Cir. 2002)).

Plaintiff offers little to suggest that his non-promotion
was based on his race.  Plaintiff begins by pointing to the
racial makeup of the SOI office and argues that SOI has a history
of not promoting black employees.  (Pl.'s Mem. Opp'n at 4.)
Although statistics can in some cases support a finding of
pretext, Cook v. Boorstin, 763 F.2d 1462, 1468 (D.C. Cir. 1985)
(stating that statistics can be used in disparate treatment
discrimination cases to illustrate a history of discrimination or
to show that a defendant's nondiscriminatory justification is
merely a pretext for not hiring or promoting an employee),
plaintiff has provided no sufficiently meaningful or detailed
historical statistics.  (See Pl.'s Mem. Opp'n at 4 (stating that
there are no African-American male managers at SOI and that
plaintiff is one of only seven African-Americans in his entire
division).)  Rather than merely stating that the majority of
highly-ranked employees at SOI are white, the plaintiff must
"demonstrate to the court's satisfaction that [his] statistical
comparisons are meaningful, and in particular, plaintiff['s]
statistics must compare the promotion rates of class members with

the rates of similarly situated whites within the company." See McReynolds v. Sodexho Marriott Servs., 349 F. Supp. 2d 1, 8 (D.D.C. 2004) (citation omitted) (holding that the plaintiffs adequately made a prima facie case of discrimination when they proved, through statistical analyses, that management's subjective decision-making process for filling vacancies was discriminatory against African-Americans).  Plaintiff has not met this standard because he has failed to show actual statistics comparing rates of promotion at SOI between similarly situated black and white employees, or even statistics comparing rates of hiring black and white applicants to their presence in the applicant pool.  See Metrocare v. Wash. Metro. Area Transit Auth., 679 F.2d 922, 930 (D.C. Cir. 1982) (holding that while "[p]roper statistical evidence can be the most important vehicle for showing class discrimination," the plaintiff failed to "compare the percentage of blacks hired for given jobs with the percentage of blacks qualified for those positions" and it was not sufficient to merely show that black managers formed a smaller percentage of the manager pool than did managers of other races); Anderson v. Group Hospitalization, Inc., 820 F.2d 465, 469 (D.C. Cir. 1987) (agreeing that "no inference of unlawful racial animus can be drawn from a statistical comparison that fails to account for relevant job qualifications").

Plaintiff also attempts to refute the defendant's non-discriminatory justification by alleging that there is an issue of fact regarding whether the "formula was designed so that black employees in the office who had not received outstanding evaluation[s] would not be able to compete for the promotion" because "[a]ll of the points awarded depended upon the performance evaluations which had already been given in the previous rating cycle." (Pl.'s Stmt. Gen. Iss. at 12.)  This argument is flawed for three reasons.  Plaintiff fails to support the allegation with any specific facts sufficient to expose a genuine issue for trial.  In addition, not all of the points awarded were determined from the performance evaluations; the performance evaluation comprised only a part of each applicant's score.  (Id.)  The mathematical scoring formula also awarded points for the KSAs of each employee (as judged by the panel and partially determined by the employee's application for the promotion) and for awards received by the employee.  (Id.)  Moreover, even if the plaintiff were to have received the maximum of thirty points on his performance evaluation sub-score, his score still would not have been high enough because his application was deemed insufficiently detailed or comprehensive

- 23 -

(see Def.'s Mot. Summ. J., Ex. 13, First Step Response at 3), and because he had not received any awards.[6]

Thus, plaintiff has not produced evidence to show that defendant's proffered explanation for defendant's non-promotion is unworthy of credence, nor has plaintiff presented independent evidence of defendant's racial discrimination to show that discrimination more likely motivated the non-promotion. See Burdine, 450 U.S. at 253. On this record, no reasonable jury could find such discrimination, see Morgan, 328 F.3d at 651, and defendant's motion for summary judgment on the discrimination claim will be granted.

II. RETALIATION

Like discrimination claims, claims of retaliation are also "governed by the McDonnell Douglas burden-shifting scheme." Carney v. Am. Univ., 151 F.3d 1090, 1094 (D.C. Cir. 1998). In short, then, the burden first rests with the plaintiff to establish a prima facie case, after which the burden shifts to the defendant to rebut the presumption of retaliation. See Burdine, 450 U.S. at 252-53. Finally, the burden shifts back to

---

[6]  If plaintiff were to have received a perfect sub-score for his performance evaluation, his total score would be calculated as follows:  Performance Evaluation (30) + KSAs (11.12) + Awards (0) = 41.12.  This amount is 3.6 points below the cut-off score.  (See Def.'s Mot. Summ. J., Ex. 5, Rating Sheet for Pl.)

- 24 -

the plaintiff to show that the defendant's justification is merely a pretext.  Id.

    A.   Plaintiff's prima facie case

    To establish a prima facie case of retaliation, the plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) his employer took an adverse personnel action against him; and (3) a causal connection exists between the protected activity and the adverse action.  Carney, 151 F.3d at 1095; see Taylor v. Small, 350 F.3d 1286, 1292 (D.C. Cir. 2003).

    Here, plaintiff clearly has met the first prong of the prima facie analysis.  Title VII protects the rights of federal employees to oppose any "unlawful employment practice" enumerated in Title VII.  42 U.S.C. §§ 2000e-16 to 16c (2000).  Plaintiff filed a grievance with the NTEU regarding alleged discrimination in his non-promotion to a GS-14 level position, a statutorily protected activity.  (Compl. at 4.)

    Identifying the adverse personnel action for this claim, however, requires closer scrutiny.  "An adverse personnel action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Romero-Ostolaza v. Ridge, 370 F. Supp. 2d 139, 150 (D.D.C. 2005).  The Tenth and Seventh

Circuits liberally interpret the second prong of the prima facie
case to include acts that are "'committed by [a plaintiff's]
employer, [but] are unrelated to employment as such.'"  Aviles v.
Cornell Forge Co., 183 F.3d 598, 605 (7th Cir. 1999) (quoting
Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881, 892 (7th Cir.
1996)); Dick v. Phone Directories Co., 397 F.3d 1256, 1268 (10th
Cir. 2005) (holding that where coworkers filed a complaint with
police about the plaintiff, an adverse action had not occurred
because the complaint did not escalate to include prosecution,
and noting that "criminal prosecution involving a public criminal
trial would have an 'obvious impact' on the employee's 'future
employment prospects'").

Here, the plaintiff was placed on administrative leave
following the second TIGTA investigation which involved his
alleged threats against Petska.  (Def.'s Mot. Summ. J., Ex. 21,
Admin. Leave Notice.)  However, placement on administrative leave
may not constitute an adverse personnel action.  See Breaux v.
City of Garland, 205 F.3d 150, 158 (5th Cir. 2000) (holding that
an employee on administrative leave had not suffered adverse
action with respect to the leave); Haddon v. Executive Residence
at the White House, 313 F.3d 1352, 1363 (Fed. Cir. 2002) (stating
that "[m]ost of the actions that courts have recognized as
adverse employment actions are more tangible and permanent than
[a] short suspension without loss of pay"); Peltier v. United

States, 388 F.3d 984, 988 (6th Cir. 2004) (holding that plaintiff did not suffer an adverse personnel action when she was suspended with pay pending a timely investigation into suspected wrongdoings).

The plaintiff claims that the retaliation included the two investigations of his conduct, his arrest, and his criminal prosecution.  (Compl. at 7.)  An internal investigation, police complaint, or police report will generally not qualify as an adverse action.  Haddon, 313 F.3d at 1363-64 (internal investigation); Lu v. Billington, Civil Action No. 02-938 (PLF), 2005 WL 670771, at *6 (D.D.C. Mar. 22, 2005) (police complaint/report).  Here, however, defendant initiated a criminal prosecution by obtaining an arrest warrant against plaintiff, which led to his being charged and tried.  (Def.'s Mot. Summ. J., Ex. 18, Aff. Supp. Arrest Warrant at 178; Def.'s Mot. Summ. J., Ex. 16, Petska Threat Investigation at 16.)  Although these actions are not obvious "personnel" actions, they could have an adverse effect on the plaintiff's future career prospects, and as such, could be considered adverse personnel actions.  See Berry v. Stevinson Chevrolet, 74 F.3d 980, 986 (10th Cir. 1996) (holding that the "filing of charges against a former employee may constitute adverse action" because a "criminal trial, such as that to which [the plaintiff] was subjected, is necessarily public and therefore carries a significant risk of humiliation,

damage to reputation, and a concomitant harm to future employment prospects"). The plaintiff, therefore, arguably has established adverse actions taken against him by his employer because TIGTA procured an arrest warrant and arrested plaintiff, which led to his criminal prosecution.

The third prong of the prima facie case is whether a causal connection exists between the statutorily protected activity and the adverse action. See Carney, 151 F.3d at 1095. The causal connection element can be established by showing "that the employer knew of [plaintiff's] protected activity and that the retaliation closely followed it." Kwon v. Billington, 370 F. Supp. 2d 177, 187 (D.D.C. 2005); see also Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985). As more time "elapses between the protected activity and the alleged acts of retaliation, however, the more difficult it is to demonstrate any causal connection." Saunders v. DiMario, Civil Action No. 97-1002 (PLF), 1998 WL 525798, at *5 (D.D.C. Aug. 14, 1998) (holding that where eight to ten years had passed between the plaintiff's EEO activity and the adverse personnel action, a causal connection was not demonstrated); see also Clark v. Chrysler Corp., 673 F.2d 921, 930 (7th Cir. 1982) (holding that time lapse of two years between the filing of an EEO charge and the alleged retaliatory act negates an inference of causal connection).

- 28 -

Here, plaintiff filed his grievance with the NTEU on
January 17, 2001.  (Compl. at 4.)  Defendant knew about the
grievance because the management in SOI was required to meet with
the plaintiff and his union representative to address the issue
on April 11, 2001.  (Roberson Aff. at 3.)  The actions most
cognizable as adverse employment actions - - defendant's
initiation of criminal proceedings against plaintiff and arrest
of plaintiff - - occurred on October 30, 2001, and November 1,
2001, respectively.  (Def.'s Mot. Summ. J., Ex. 18, Aff. Supp.
Arrest Warrant at 178; Def.'s Mot. Summ. J., Ex. 16, Petska
Threat Investigation at 16.)  Roughly nine months passed between
the filing of the grievance (January 17, 2001) and the
defendant's initiation of criminal proceedings by obtaining a
warrant (October 30, 2001).  (Compl. at 4; Def.'s Mot. Summ. J.,
Ex. 18, Aff. Supp. Arrest Warrant; Def.'s Mot. Summ. J., Ex. 16,
Petska Threat Investigation at 16.)  Although case law suggests
that after approximately an eight month lapse of time between the
protected activity and the adverse action, the two are not always
causally indicative of retaliation, Devera v. Adams, 874 F. Supp.
17, 21 (D.D.C. 1995) (stating that an eight month lapse does not
strongly suggest a causal link), plaintiff's arrest was the
result of two investigations that began just three weeks (for the
investigation beginning on February 6, 2001) and five-and-one-
half months (for the investigation beginning on July 2, 2001)

- 29 -

after plaintiff filed his discrimination grievance on January 17,
2001.  (Def.'s Mem. Supp. at 5-6; Def.'s Mot. Summ. J., Ex. 9,
Skelly Threat Investigation; Def.'s Mot. Summ. J., Ex. 16, Petska
Threat Investigation.)  While the investigations are not
considered adverse actions, they were the precursors to the
plaintiff's arrest, and thus, should be considered within the
temporal proximity calculation in viewing the facts in the light
most favorable to the plaintiff.  (Def.'s Mot. Summ. J., Ex. 18,
Aff. Supp. Arrest Warrant at 178-80.)  A three-week or five-and-
one-half-month time lapse between plaintiff's protected activity
and the employer-initiated investigations leading to defendant's
adverse actions are likely sufficient for plaintiff to establish
a prima facie case of retaliation.[7]

    B.    Defendant's neutral explanation

    The defendant effectively rebuts the presumption of
retaliation by providing evidence of the non-discriminatory
reason compelling the TIGTA investigations, arrest, and
prosecution of the plaintiff: employee reports of threats made to
the lives of Skelly, Petska, and other SOI employees.  (Def.'s
Mot. Summ. J., Ex. 9, Skelly Threat Investigation; Def.'s Mot.
Summ. J., Ex. 16, Petska Threat Investigation.)  Employees said
that they heard plaintiff threaten the lives of both Skelly and

---

[7]  The result is the same if only the second investigation
led to the plaintiff's actual arrest.

- 30 -

Petska, and talk about bringing a gun into work.  (<u>Id.</u>)  As the defendant mentions, employers are obligated to reduce the amount of occupational health and safety hazards at their places of employment.  29 U.S.C. § 651.  Defendant claims that SOI management was merely trying to protect its employees by assuring that thorough investigations and, if needed, prosecution, were completed regarding the alleged threats.  (Def.'s Mem. Supp. at 24-25.)  The employer's burden is merely to produce evidence suggesting this non-discriminatory motive, and the employer does not need to persuade the court that the articulated reason was the actual motive.  <u>See</u> <u>Burdine</u>, 450 U.S. at 254-55.  By showing that employees and management of SOI were concerned about threats allegedly made by the plaintiff, the employer has more than met its burden of production.

    C.   <u>Plaintiff's evidence of pretext</u>

    Plaintiff claims that the reports of alleged threats he made were pretexts for the investigations, his arrest, and his criminal prosecution, because SOI actually singled him out for harassment because of his race and in retaliation for having filed a grievance.  (Pl.'s Mem. Opp'n at 25.)  Plaintiff also cites to the fact that out of the hundreds of other investigations for threatening statements, Jackson can remember only one other resulting prosecution.  (<u>Id.</u>; Pl.'s Mem. Opp'n, Ex. 21, Jackson Dep.)  Plaintiff attests that, because of this

information, "a reasonable fact finder can . . . find that [plaintiff] was subjected to these conditions because of his protected activity and his race and gender."  (Pl.'s Mem. Opp'n at 24.)

Although a reasonable fact finder could believe that the plaintiff never made the threats alleged by his co-workers - - charges of which he was acquitted - - plaintiff has not produced evidence showing that management knew, or had reason to know, that reports of the threats were fabricated.  Without any such evidence showing that the defendant should not have believed the reports of threats, there is no indication that the defendant acted on the reports to retaliate against the plaintiff for having filed a discrimination grievance.  Instead, the evidence suggests only that the defendant acted out of workplace safety concerns.  (See Def.'s Mem. Supp. at 24-25.)  Because the plaintiff has failed to meet his burden of production on this issue, summary judgment will be granted.

III. HOSTILE WORK ENVIRONMENT

Defendant argues that plaintiff is now, for the first time, attempting to assert a hostile work environment claim in his opposition and should be precluded from doing so.  (See Pl.'s Mem. Opp'n at 21-25; Def.'s Reply to Pl.'s Opp'n at 1 n.1.) Plaintiff did not specifically articulate a hostile work environment claim in his complaint or raise one in any of the

administrative proceedings leading up to this case.  (See Def.'s Reply to Pl.'s Opp'n at 1 n.1, Ex. 1 (Investigative Summary); Def.'s Mot. Summ. J., Ex. 17 (Third Step Response); see also Compl.)  Filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suing in federal court, but rather is a statutory precondition subject to equitable defenses.  Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982).  Plaintiff's failure to exhaust, or even attempt to exhaust, the administrative remedies available to him on a hostile work environment claim does not automatically deprive the court of subject matter jurisdiction to address it.  See Kennedy v. Whitehurst, 690 F.2d 951, 961 (D.C. Cir. 1982).

Even when "administrative claims did not formally allege a hostile work environment charge, the claim is properly before the Court[] . . .[where a] Title VII lawsuit includes the claims that are 'like or reasonably related to the allegations of the administrative charge and growing out of such allegations.'" Jones v. Billington, 12 F. Supp. 2d 1, 7 (D.D.C. 1997) (citing Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995)) (holding that where the plaintiff's complaint alleges facts forming the basis for discrimination and retaliation claims, those same facts sufficiently alluded to a claim of hostile work environment where all claims were based on conduct alleged in the EEOC charge); see also Bell v. Gonzales, Civil Action No. 03-163 (JDB), 2005 WL

691865, at *4 (D.D.C. Mar. 25, 2005) (holding that exhaustion requirement was satisfied even though hostile work environment was not included in formal EEO charge because it related to the conduct alleged in the charge).

Here, as in <u>Jones</u>, 12 F. Supp. 2d at 7, the plaintiff's hostile work environment claim stems from the plaintiff's original allegations of discrimination and retaliation. Plaintiff's complaint states that his EEO complaint alleged race "discrimination on the part of the defendant by, <u>inter alia</u>, having him arrested and prosecuted based upon trumped-up charges . . . ; barring him from access to Agency buildings; placing him on indefinite administrative leave with pay; and . . . issuing a letter of counseling." (Compl. at 1.) These allegations are sufficient to support plaintiff's contention that the defendant was put on notice of a potential hostile work environment claim by plaintiff. <u>See, e.g.</u>, <u>Childs-Pierce v. Utility Workers Union of America</u>, Civil Action No. 03-1271 (JDB), 2005 WL 1983577, at *14 & n.15 (D.D.C. Aug. 10, 2005) (holding that defendant was on notice that plaintiff might pursue a claim for hostile work environment where plaintiff's hostile work environment claim was based on the same set of facts as her disparate treatment and retaliation claims, specifically that plaintiff was subject to unwelcome harassment when she was suspended for five days, denied sick leave, ordered to provide medical documentation, ordered to

undergo a medical examination, and ordered to return the office
keys prior to her suspension).

Nevertheless, plaintiff has not made a prima facie showing
of a hostile work environment claim.  To prevail on a hostile
work environment claim based on race, the plaintiff employee must
show that: (1) the employee was a member of a protected class;
(2) the employee was subjected to unwelcome harassment; (3) the
harassment complained of was based upon race; (4) the charged
harassment had the effect of unreasonably interfering with the
plaintiff's work performance and creating an intimidating,
hostile, or offensive working environment; and (5) that the
employer knew or should have known of the harassment, but failed
to take any action to prevent it.  Snowden v. Kelso, II, Civil
Action No. 93-1393 (PLF), 1996 WL 43549, *3 (D.D.C. Jan. 31,
1996); Jones, 12 F. Supp. 2d at 11; Beamon v. Marshall & Ilsley
Trust Co., 411 F.3d 854, 863 (7th Cir. 2005).[8]  The hostile work
environment must be the result of discrimination based on the
plaintiff's protected status.  Kelley v. Billington, 370 F. Supp.
2d 151, 157 (D.D.C. 2005) (noting that because almost any person

---

[8]A hostile work environment exists when "the workplace is
permeated with 'discriminatory intimidation, ridicule, and
insult,' that is 'sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an abusive
working environment' . . . ."  Harris v. Forklift Sys., Inc., 510
U.S. 17, 21 (1993) (citation omitted) (citing Meritor Sav. Bank,
FSB v. Vinson, 477 U.S. 57, 65, 67 (1986) (internal brackets and
quotation marks omitted)).

can claim some kind of protected status, a hostile work environment claim will fail if the plaintiff cannot link the harassment to his protected status.)  Incidents unrelated to the plaintiff's race cannot be used to support a hostile work environment claim.  <u>Id.</u> at 158 (noting that many of the incidents of harassment cited by plaintiffs were not related to their race, and therefore could not be used to support a hostile work environment claim).

Here, plaintiff has failed to satisfy essential elements of a prima facie showing of a hostile work environment claim based on race.  Plaintiff describes the various facts surrounding his non-promotion, administrative leave, arrest, prosecution, and return to work.  (Compl. at 1, 3-6; Pl.'s Reply to Reply at 1-4.) However, as in both <u>Beamon</u> and <u>Jones</u>, where the courts found "one omission particularly glaring . . . [namely, that] there is no evidence that any of [the employer's] actions were motivated by [plaintiff's] race,"  411 F.3d at 863; 12 F. Supp. 2d at 12, plaintiff here has presented no direct, circumstantial, statistical, or other evidence showing that the harassment of which he complains was based on or prompted by his race, nor has he shown that his working conditions were permeated with racially discriminatory behavior.  Thus, any hostile work environment claim plaintiff has sought to raise cannot survive summary judgment.

- 36 -

CONCLUSION

Because the plaintiff has failed to adequately rebut the defendant's non-discriminatory justifications for the non-promotion, investigation, and prosecution of the plaintiff, the plaintiff has not established that any material facts are left in dispute and, consequently, defendant's motion for summary judgment will be granted on both the discrimination and retaliation claims.  Because plaintiff has failed to demonstrate that the harassment he complains of was based upon his race, summary judgment will be granted on any hostile work environment claim.  A final Order accompanies this Memorandum Opinion.

SIGNED this  12th  day of   September  , 2005.


_____/s/_____

RICHARD W. ROBERTS
United States District Judge